IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL B. CORSON, ) | |
| ) | |
| Petitioner, ) | Case No. CV 05-396-S-MHW |
| ) | |
| v. ) | **MEMORANDUM DECISION** |
| ) | **AND ORDER** |
| JO ANNE B. BARNHART, Commissioner, ) | |
| Social Security Administration, ) | |
| ) | |
| Respondent. ) | |
| _____) | |

## <u>Introduction</u>

Currently before the Court for its consideration is Petitioner Michael B. Corson's

("Petitioner") request for judicial review (Docket No. 1) of the Respondent's denial of social

security disability benefits, filed September 27, 2005.  Petitioner brought this action pursuant to

the Social Security Act (Act), as amended, 42 U.S.C. § 405(g).  The Court has reviewed the

Petition for Review and the Answer, the parties' memorandums, the administrative record

("AR") and for the reasons that follow, will affirm the decision of the Commissioner.

# I.
# Background

## A.      Administrative Proceedings

Petitioner filed an application for Social Security Disability Insurance Benefits and Supplemental Social Security Income on August 14, 2002.  (AR 87.)  He alleged disability since July 10, 2002.  (AR 60.)  The application was initially denied on March 17, 2003 (AR 39) and upon reconsideration on June 24, 2003.  (AR 32.)  After a timely request for a hearing was filed on July 31, 2003 (AR 30-31), Petitioner, represented by attorney representative Andrea Cardon (AR 22), appeared and testified before Administrative Law Judge (ALJ) Robin L. Henrie on August 17, 2004.  (AR 291.)  Vocational expert Anne F. Aastum (AR 12), also appeared and testified as did Petitioner's wife, Christy Corson.  (AR 291.)

ALJ Henrie considered the testimony and all other evidence of record and on January 26, 2005, issued a decision finding Petitioner not disabled within the meaning of the Act, and therefore was not entitled to disability insurance benefits.  (AR 26.)  This became the final decision of the Commissioner when the Appeals Council declined to review the ALJ's decision on July 28, 2005.  (AR 8.)  Petitioner has exhausted all administrative remedies and is seeking judicial review pursuant to Section 405(g) of the Social Security Act.

## B.      Statement of Facts

At the time of the hearing before the ALJ, Petitioner was forty-one (41) years old.  (AR 23.)  Petitioner has an 8th grade education (AR 23) and attended truck driving school.  (AR 96.)  His prior work experience consists of truck driver and laborer.  (AR 23.)  Petitioner alleged disability since July 10, 2000 due to left knee injury which has resulted in severe pain, instability, an inability to sit, stand or walk for any length of time, and an inability to bend, twist

or kneel.  (AR 13.)  Petitioner also addresses his right eye vision loss, glaucoma, depression, sleep disturbance, and concentration and memory problems in his application documents and the hearing testimony.  (AR 13.)

When Petitioner was nine years old, he suffered an injury that left him partially blind in his right eye.  (AR 156.)  Petitioner underwent reconstructive surgery on his left anterior cruciate ligament (ACL) in 1981.  (AR 14.)  There was no reports of any problems with Petitioner's knee until July 10, 2000, when Petitioner tried to catch some pallets falling off a truck at work and he reinjured his left knee.  (AR 116).  After the accident, Petitioner was treated by Dr. Richard Moore, underwent physical therapy, wore a brace, and suffered from pain and instability.  (AR 119-120, 156.)  A MRI done on July 29, 2000 suggested disruption of the ACL in his left knee.  (AR 121.)   Petitioner was also seen by Dr. Sid Garber, an orthopedic physician, following his accident.  (AR 115-116.)  On November 22, 2000, Petitioner was seen by Dr. Andrew Curran, D.O., after he had recently slipped when getting out of the shower which led to increasing pain and a possible straining of his medial collateral ligament (MCL).  (AR 154.)  When he was evaluated again by Dr. Curran on July 31, 2001, he assessed Petitioner with "left anterior cruciate ligament insufficiency with possible medial meniscal tear."  (AR 124.)

On February 8, 2001, Petitioner underwent a left lateral ACL "reconstruction revision with bone, tendon, bone allograft" and "hardware removal left tibia" performed by Dr. Curran.  (AR 125-126.)  Following the surgery, Petitioner still suffered from pain and instability so he underwent another ACL reconstruction revision performed by Dr. Curran on May 10, 2001.  (AR 129-130.)  On July 31, 2001, Petitioner went to the emergency room at Mercy Medical Center in Nampa, Idaho, after feeling something give in his knee while driving a truck for work.  (AR

**Memorandum Decision and Order - Page 3**

132.)  Petitioner was seen by Dr. Curran the following day and was noted to walk with a markedly antalgic gait on the left side but had full range of motion.  (AR 140.)

In October of 2001, Petitioner began seeing Dr. Richard DuBose, who specialized in pain medicine, at the Idaho Pain Center.  (AR 194.)  At the time, Petitioner reported to suffer from constant knee pain, described as an 8-9 on a VAS scale, with the pain being worse at night, and there being a burning and grabbing component to the pain.  Petitioner also complained of weakness in his lower left extremity and was taking 2-4 Vicodin, a pain medication, per day and 2-4 Advil per day.  (AR 194-195.)  Dr. DuBose assessed Petitioner with complex regional pain syndrome (CRPS), type 2, and causalagia. (AR 195.)  Petitioner was prescribed Neurontin, Nortriptyline to aid in sleep, Lidoderm patch to help with the left knee's hypersensitivity, and Norco for breakthrough pain.  (AR 196.)  A month later, Petitioner's pain was noted by Dr. DuBose as tolerable but not under great control.  He was given a low dosage of methadone in addition to his other medications.  (AR 193.)   Petitioner continued to see Dr. DuBose every other month or every few months.  In February of 2002, Dr. Dubose assessed Petitioner with atypical neuropathic pain in his left knee and somatic left knee pain.  (AR 192.)  The following month, Petitioner was seen by Dr. Robert Rabiea who performed an MRI and noted that his findings were consistent with a lateral meniscal tear.  (AR 158-159.)  At a June 2002 appointment with Dr. DuBose, it was noted that Petitioner had stopped taking Neurontin and Nortriptyline because of nausea but continued using the Lidoderm patch and Norco.  It was also noted that he was using a cane. (AR 191.)  Petitioner also saw Dr. Robert Burks that same month.  Dr. Burks determined that an ACL reconstruction was not warranted at the time as it would only help with Petitioner's instability but not his pain.  (AR 168-169.)   In August of 2002,

**Memorandum Decision and Order - Page 4**

Petitioner saw Dr. DuBose's physician's assistant, Mr. Rambow.  Mr. Rambow noted that

Petitioner was only taking an occasional Norco for pain and that after several months of Dr.

DuBose suggesting a lumbar sympathetic block, Petitioner still had not scheduled the procedure.

(AR 189.)  Also that month, Petitioner began seeing Mark Snow, a licensed psychologist, for

depression and to work on relaxation and pain control techniques.  (AR 171.)  Petitioner began

taking the antidepressant Celexa.  (AR 241.)  At his first appointment with the psychologist, Mr.

Snow noted that Petitioner was "alert, attentive and cooperative.  Appeared to be a reliable

historian with good short term and long term memory."  (AR 174.)

In October of 2002, Mr. Rambow informed Petitioner that he was probably at MMI

(maximum medical improvement).  At this time, Petitioner was taking Norco at bedtime and

using the Lidoderm patch.  (AR 186.)  Later during that month, Petitioner underwent a left

lumbar sympathetic block.  (AR 185.)  A week later, Mr. Rambow noted that the lumbar block

seemed to improve Petitioner's hypersensitivity in his knee but not his deep somatic pain.  Mr.

Rambow stated that he could not see Petitioner going back to work as a trucker and that he

would probably need long term medical care.  (AR 184.)  On November 27, 2002, Mr. Rambow

confronted Petitioner about a surveillance tape he had received from the State Insurance Fund

which showed Petitioner walking on several different days at several different locations without

a limp and without use of a cane.  When confronted, Petitioner replied that he had good days and

bad days and sometimes he did not need a cane.  (AR 183.)

Petitioner was examined by an osteopathic physician, Dr. Richard Radnovich, on

December 30, 2002.  Dr. Radnovich noted that Petitioner was able to move about the room

without difficulty but did walk carefully.  He concluded that Petitioner's history of surgeries and

objective findings represented significant challenges to Petitioner's ability to work and that job retraining might be a viable option.  (AR 176-177.)  The doctor also noted that physical activities such as lifting, carrying, climbing and squatting would be inadvisable for Petitioner, but that jobs which involved sitting, handling fine objects, hearing and mentation would not be precluded. (AR 176-177.)

On March 19, 2003, at another visit to the Idaho Pain Center, Mr. Rambow stated he would never support Petitioner in total disability and that he believed Petitioner can and should work, although he would not be able to continue work as a truck driver.  (AR 181.)  In June of 2003, Dr. Garber, who had seen Petitioner on and off for several years, stated that Petitioner was "unable to return to work and probably won't be able to return to any kind of vigorous activity until he can have this knee stabilized."  Dr. Garber was unsure whether any further surgery would be beneficial or not and stated that Petitioner has "a very legitimate disability that prevents him from any kind of active job."  (AR 198.)  That same month, Dr. DuBose stated that Petitioner's pain seemed "out of proportion to what we could see on examination."  In his opinion, Petitioner did not have complex regional pain syndrome (CRPS) nor regional sympathetic dystrophy (RSD).[1]  Dr. DuBose stated that his understanding was that Petitioner was not a good candidate for operation at that time.  (AR 234.)  On September 15, 2003, after Petitioner completed the Minnesota Multiphasic Personality Inventory (MMPI-2), Mr. Snow noted that the test suggested a "psychological component to [Petitioner's] pain behavior but [did not] indicate any malingering."  (AR 253-254.)  Petitioner saw Dr. Michael Gustavel in December of 2003.  An MRI was conducted which showed ACL fibers intact but some

---

[1] In October of 2001, Dr. Dubose's assessment was that Petitioner did have complex regional pain syndrome, type 2.  (AR 196.)

**Memorandum Decision and Order - Page 6**

abnormality and also significant changes in the medial meniscus and possible changes in the lateral meniscus.  (AR 269.)

In January of 2004, Petitioner underwent a left knee arthroscopy, debridement of partial ACL tear and chondroplasty of his lateral femoral condyle performed by Dr. Gustavel.  (AR 265.)   Six weeks after the operation, Petitioner's pain was improving but he still felt unstable when performing daily activities.  (AR 264.)  In March of 2004, Mr. Snow noted that Petitioner was less depressed and taking less pain medication.  (AR 263.)   On April 16, 2004, Dr. Gustavel noted that the pain and strength of Petitioner's knee was improving following the surgery but that Petitioner was still unstable and his knee often gave out on him.  (AR 262.)

## II.
## Findings of the Administrative Law Judge

In the decision issued following the hearing (AR 12-26), the ALJ made specific findings as follows:

1.  The claimant met the disability insured status requirements of the Act on July 10, 2002, the date the claimant alleged an inability to work and continues to meet them through December 1, 2005.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset date as noted above.

3.  The claimant alleges the severe impairment(s) noted above, which are incorporated herein by reference.

4.  The claimant does have severe impairment(s), which combine to significantly limit the ability to perform basic work-related activities, as set forth in detail above.

5.  The exhibits and testimony do not establish that a listing is met or equaled in this case.

6.  The ALJ has determined that claimant's credibility regarding symptom testimony as set forth in detail above in the body of the decision.  Such credibility findings

are incorporated herein by reference.  It is concluded that the claimant's impairments and symptoms do not preclude the occupations suggested by the vocational expert.

7.     The claimant suffers from severe impairments, which reduce the residual functional capacity to the performance of only a limited range of sedentary work, as set forth in detail in the body of the decision.

8.     The claimant is unable to perform any past relevant work, for the reasons detailed above.

9.     The claimant is 41 years of age, which is defined as a "younger individual."

10.    The claimant has an 8th [grade] education.

11.    Work skills are not an issue in this matter as noted in detail above.

12.    Considering these vocational factors and the claimant's residual functional capacity, Medical-Vocational Rules 201.25 and 201.26 provide the framework for a finding of "not disabled."  Within this framework the claimant could perform a significant number of jobs, in the national economy, in the various occupations cited by the vocational expert, as set forth in detail above.

13.    The claimant has not been under a "disability," as defined in the Social Security Act, at any time prior to the date of this decision.

### III.
### Standard of Review

The Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *See* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Fitch*, 438 F.2d 920, 921 (9th Cir. 1971).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he not only cannot do his previous work but is unable, considering his age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national

economy.  42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Social Security Commissioner if the decision is supported by substantial evidence and is not the product of legal error.  42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); and *DeLorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla but less than a preponderance, *Jamerson v Chater,* 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist which supports the petitioner's claims.  42 U.S.C. § 405(g); *Flaten v. Sec'y of Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).   Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  *Id.*  It is well-settled that if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner."  *Verduzco v. Apfel,* 188 F.3d 1087, 1089 (9th Cir. 1999).

In reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard self-serving statements.  *Rashad v.*

*Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990).  Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence.  *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

The Social Security Commissioner has established a five-step evaluation process in order to determine whether a person is disabled for purposes of awarding disability benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lester v. Chater,* 81 F.3d 821, 828 n. 5 (9th Cir. 1995); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  First, the Commissioner determines whether the claimant is engaged in substantial gainful activity.  If the claimant is engaged in such activity, disability benefits are denied.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  The ALJ determined that the Petitioner had not been involved in any substantial gainful activity since July 10, 2000, the alleged onset date of disability.  (AR 13.)

Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.  The ALJ here found that severe impairments have been diagnosed and treated from the alleged onset date to the date of his decision (a period of 12 continuous months or more) and that such impairments are of sufficient duration to more than minimally limit the claimant's ability to perform basic work activities.  (AR 13.)

If the impairment is severe, the Commissioner proceeds to the third step of the evaluation

**Memorandum Decision and Order - Page 10**

process to determine whether the claimant has an impairment which meets or equals those contained in the Listing of Impairments found in Appendix 1, Subpart P, Regulation No. 4 and meets the duration requirement.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d), (e); 416.920(a)(4)(iii), (d), (e).  Appendix 1 contains a list of impairments which would prevent a person from engaging in substantial gainful employment.  If a claimant can show he or she is limited by such an impairment, disability is presumed.   The ALJ here determined that Petitioner's severe impairments did not meet or medically equal the severity of any of the listings in Appendix 1, Subpart P, Regulation No. 4.  (AR 14.)

If the impairment is not one that is presumed to be disabling, then the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past, i.e. whether the claimant has sufficient residual functional capacity to tolerate the demands of any past relevant work.  If the claimant is able to perform past work, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).  In the instant case, the ALJ determined that the Petitioner had the residual functional capacity to perform the full range of sedentary work, except that such work could not require: lifting more than 8.5-10 pounds at a time; lifting or carrying lighter articles weighing more than 3-4 pounds, on an occasional basis; standing or walking more than 15-20 minutes at a time, nor more than 2-3 hours in an 8-hour workday, with the option to use a cane to relieve knee pressure; sitting more than 30-45 minutes at a time, nor more than 5-6 hours in an 8-hour workday; sitting, standing or walking more than 5-10-15 minutes at a time (the sit/stand option), which means that duties could be performed seated or on one's feet, and that periodically, when needed, the claimant could take a break from

sitting and stand up and work and typically would be up anywhere from 5 to 15 minutes at a time; stooping, bending or squatting of any significance; work on the floor (no kneeling, crawling, crouching, etc.); stair climbing (a few steps not precluded); no fine right eye vision (no binocular vision) or sustained (more than 1/3 - 2/3 of the day) fine acuity work, such as reading. Also, the work area must allow for room under the work area to flex/extend/move the leg/knees; the work must allow for option to use a knee brace while on the job; and the work cannot require sustained walking on uneven surfaces.  Based on these conclusions and in considering Petitioner's previous work experience was as a truck driver/laborer, the ALJ concluded that Petitioner could not perform any past relevant work.  (AR 22-23.)

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine whether the claimant can make an adjustment to other work after considering the claimant's residual functional capacity, age, education and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  Based on the testimony of the vocational expert and using Medical-Vocational Rules 201.25 and 201.26 as a framework for decision-making, the ALJ concluded that occupations exist in significant job numbers in the national economy which the Petitioner is capable of performing and therefore Petitioner is "not disabled" under step five of the evaluation.  (AR 24.)

## IV.
## Issues Raised

The primary issue before the Court is whether the final decision of the Secretary is supported by substantial evidence and whether it is based on proper legal standards.  *Matney ex rel. Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992).  Petitioner contends that the ALJ erred in the following respects:

**Memorandum Decision and Order - Page 12**

1)      The ALJ did not properly support his findings that the Petitioner was not credible.

2)      The ALJ did not give reasons for rejecting lay witness testimony.

3)      The ALJ's finding of the Petitioner's residual functional capacity was not proper.

4)      The ALJ improperly disregarded the opinion of Dr. Garber.

The Court will take each argument in order.

## V.
## Discussion

**A.      Failure to Properly Support Finding that Petitioner was Not Credible**

Petitioner asserts that the ALJ failed to provide "clear and convincing" reasons for rejecting Petitioner's testimony regarding severity of symptoms as the ALJ's conclusions were based on incorrect facts and conclusions beyond the record.  Petitioner submits that the ALJ relied almost completely on statements from Dr. DuBose and Mr. Rambow and ignored the other treating physicians. Regarding the State Insurance Fund tape relied on by the ALJ, Petitioner points out that he never lied to Mr. Rambow when questioned about the tape, stating he does have some "good days."  He points out that it is not known when these tapes were made, at what point in his recovery Petitioner was at, that the ALJ never asked him about these tapes and also that it was prejudicial for the ALJ to rely so heavily on them without eliciting more testimony from Petitioner about them.  Petitioner also maintains that the ALJ did not cite to any discrepancies in the Petitioner's inability to do basic daily activities.  As for the ALJ's conclusion that Petitioner did not follow "prescribed treatment," he submits that the only reason he stopped taking a medication was due to severe side effects and that is an acceptable reason for stopping a medication.

The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and for resolving ambiguities.  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

The ALJ's findings must be supported by specific, cogent reasons.  *Id.*  If a claimant produces

objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's

subjective complaints of pain based solely on lack of medical evidence.  *Burch v. Barnhart*, 400

F.3d 676, 680 (9th Cir. 2005).  *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir.

1997) (an ALJ may not discredit a claimant's subjective testimony on the basis that there is no

objective medical evidence that supports the testimony.)  Unless there is affirmative evidence

showing that the claimant is malingering, the ALJ must provide clear and convincing reasons for

rejecting pain testimony.  *Id.*  General findings are insufficient, the ALJ must identify what

testimony is not credible and what evidence undermines the claimant's complaints.  *Reddick v.*

*Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  The reasons an ALJ gives for rejecting a claimant's

testimony must be supported by substantial evidence in the record.  *Regennitter v. Comm'r of*

*Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999).

     In evaluating credibility, the ALJ may engage in ordinary techniques of credibility

evaluation, including considering claimant's reputation for truthfulness and inconsistencies in

claimant's testimony, or between claimant's testimony and conduct, claimant's daily activities,

claimant's work record and testimony from physicians and third parties concerning the nature,

severity and effect of the symptoms of which claimant complains.  *Thomas v. Barnhart*, 278 F.3d

947, 958-59 (9th Cir. 2002).  Also, the ALJ may consider:  an individual's daily activities;

location, duration and frequency of symptoms; factors that precipitate and aggravate those

symptoms; amount and side effects of medications; and treatment measures taken by claimant to

alleviate those symptoms.  *See* Soc. Sec. Ruling 96-7p.

**Memorandum Decision and Order - Page 14**

The ALJ's reasons for discrediting the Petitioner's subjective complaints included that the medical record does not support Petitioner's testimony, there was a surveillance tape presented to one of Petitioner's treating physicians which showed Petitioner walking without a limp or cane on several different days at several different locations, Petitioner had exaggerated symptoms and limitations and had not followed prescribed treatment.  Additionally, as to Petitioner's ability to perform mental work related activities, the ALJ noted there was no evidence of psychosis, thought disorder, cognitive limitations or memory impairment.

As stated above, it is the ALJ's job to determine credibility.  *See Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir. 1999).  If there is substantial evidence in the record to support the ALJ's credibility finding, the Court will not engage in second-guessing.  *Thomas v. Barnhart*, 278 F.3d 957, 959 (9th Cir. 2002).   If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  The issue is not whether the Court agrees with the ALJ's credibility assessment, but whether the assessment is sound.   There is substantial evidence in the record to support the ALJ's finding that the Petitioner was not fully credible as the ALJ took into consideration the objective medical evidence, inconsistencies between what Petitioner complained of and his conduct, particularly the surveillance tape noted by Mr. Rambow in his medical notes which showed Petitioner walking without a limp or cane on several occasions.  This establishes discrepancies between Petitioner's actual conduct and his testimony and between complaints in which he never mentioned "good days" where he could walk without a limp or cane until he was confronted by Mr. Rambow about the tape.  It also indicate inconsistencies between his actual conduct and how Petitioner presented himself to his physicians.

**Memorandum Decision and Order - Page 15**

The ALJ also noted that Petitioner has "exaggerated symptoms" and did not follow prescribed treatment.  Dr. DuBose found that Petitioner's pain was out of proportion to what was found on examination.  As for following prescribed treatment, Petitioner did discontinue two medications, Neurontin and Nortriptyline because of side effects, but it is noted throughout the medical record that Petitioner was only taking an "occasional" Norco for pain or taking "less" pain medication.  It also appears that Petitioner had stopped using the Lidoderm patch on his knee.  There is no record of any significant side effects with use of either of these medications.  Also, Petitioner was recommended to undergo a lumber sympathetic block for several months by Dr. DuBose before he actually underwent the procedure.

Additionally, the ALJ noted that most of Petitioner's treating physicians did not say he was precluded from all work, although all agreed he could not return to his past job as a truck driver.  Mr. Rambow stated Petitioner "can and should" work.  Dr. Garber stated Petitioner's disability prevented him from doing any kind of "active" job and Dr. Radnovich noted that although there were significant challenges to Petitioner's ability to work, job retraining was a viable option.  Dr. Radnovich also noted that jobs which involved sitting, handling fine objects, hearing and mentation would not be precluded.

The Court finds that, based on the above, there is substantial evidence in the record to support the ALJ's finding that Petitioner was not fully credible.  The Court will not engage in second-guessing when the ALJ's decision is sound and there is substantial evidence to support it.

**B.      Lay Witness Testimony**

Petitioner also argues that the ALJ did not give any reason for rejecting the testimony of Petitioner's wife.  Petitioner urges that disregard of this evidence by the ALJ violates 20 C.F.R.

§ 404.1513(c)(2).[2]

Descriptions by friends and family members in a position to observe the claimant's symptoms and daily activities has routinely been treated as competent evidence. *Smith v. Bowen*, 849 F.2d 1222, 1226 (9th Cir. 1988). Lay testimony is evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). One such germane reason is that the lay testimony conflicts with the medical evidence. *Id.*

The ALJ did discuss the testimony of Petitioner's wife in his discussion about the Petitioner's credibility. By discussing her testimony, the ALJ did not disregard it. Additionally, it was unnecessary for the ALJ to provide reasons for rejecting the testimony because he never stated that he was rejecting the testimony or that he found the witness to not be credible. The ALJ incorporated the wife's testimony into his discussion of Petitioner's testimony and his credibility. Petitioner's wife's brief testimony was very similar to what Petitioner testified to regarding his functional limitations, such as how long he can sit down, etc. The ALJ found that the medical evidence did not support Petitioner's "subjective complaints, functional limitations and disabling left extremity pain and instability to the degree alleged." (AR 21.) Even if it could be found that the ALJ did reject Petitioner's wife's testimony, the reason behind rejecting it would be the same as rejecting Petitioner's testimony - it was not supported by the medical evidence. Lay testimony conflicting with the medical evidence is a germane reason for rejecting that testimony. *Id.*

---

[2] This regulation addresses acceptable medical source opinions in cases of mental impairments. The Court believes the regulation Petitioner meant to cite is 20 C.F.R. § 404.1513(d)(4) which states that evidence from non-medical sources, such as spouses and relatives, may be considered.

**C.       Improper Finding of Petitioner's Residual Functional Capacity**

At the final step of the disability evaluation process, the ALJ determine whether the claimant can make an adjustment to other work after considering the claimant's residual functional capacity, age, education and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).   A claimant's residual functional capacity is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a).  An ALJ considers all relevant evidence in the record when making this determination.  *Id.*

There must be a significant number of jobs in the national economy the claimant can perform given his residual functional capacity.  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  The ALJ can make this determination by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines.  *Id.*   When the Guidelines inadequately account for the claimant's limitations, an ALJ should use the Guidelines as a framework only and must consult a vocational expert.  *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002).  Generally, an ALJ may rely on vocational expert testimony.  20 C.F.R. § 404.1566(e); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).  An ALJ must include all limitations supported by substantial evidence in his hypothetical question to the vocational expert, but may exclude unsupported limitations.  *Id.* at 1217.

Petitioner argues that the ALJ's Residual Functional Capacity finding is unclear as to what level of work Petitioner is capable of performing, whether it is the "full range" or "limited range" of sedentary work and/or light work.  The Court finds the ALJ clear in his finding that Petitioner is capable of performing a limited range of sedentary work.  Although the ALJ does state at one point that Petitioner is capable of performing a "full range" of sedentary work, he

also provides several limitations.  Additionally, and most importantly, it is set forth in the

"Findings" section of the decision that the Petitioner can perform a "limited range of sedentary

work."  (AR 25.)  These two statements are easily reconcilable with one another, a full range of

work with several limitations listed is essentially the same as a limited range of work.  As for the

"light work" occupations listed in the decision, the ALJ stated he included these jobs because

"the vocational expert testified that such jobs fit the description and demands of the

hypothetical," although they did not technically fall within the "sedentary work" category.  (AR

24.)  Including these jobs does not change the ALJ's ultimate conclusion that Petitioner is

capable of performing a limited range of sedentary work.

Petitioner maintains that the ALJ improperly included in its hypothetical that Petitioner

could not do stooping, bending or squatting of "any significance" as Dr. Gustaval stated that

Petitioner could "never" do any climbing, kneeling or crawling.  In reviewing the transcript from

the hearing, the Court notes that the ALJ did in fact include Dr. Gustaval's limitations in the

hypothetical.  Specifically, the ALJ, in posing the hypothetical, stated: "No kneeling, crawling or

crouching.  He could not climb flights of stairs."   There is no merit to Petitioner's argument

because the ALJ did include Dr. Gustaval's limitation.  Also, there is a difference between

"stooping, bending or squatting" and "climbing, kneeling or crawling," particularly that the latter

are more active movements than the former.  Because of this, the limitations given for each

group are entirely consistent with one another.

Petitioner contendss that the ALJ's hypothetical provided that the Petitioner can only sit

30-45 minutes at a time, must have a sit/stand option which does not require sitting, standing or

walking more than 15-20 minutes at a time and these facts alone prevent the full range of

sedentary work.   The Court notes that although the ALJ stated the Petitioner could perform the full range of sedentary work, he did include several limitations upon the work Petitioner could perform within that range.  Also, in the "Findings" section of the decision, the ALJ explicitly states: "The claimant suffers from severe impairments, which reduce the residual functional capacity to the performance of only a limited range of sedentary work, as set forth in detail in the body of the decision."  (AR 25.)  The limitations posed in the hypothetical were included in the ALJ's decision when he described the limitations on the "full range" of sedentary work that Petitioner could perform.  (AR 22-23.)

Petitioner also submits that the hypothetical is unclear because of the sit/stand option presented in it.  The Petitioner states that the hypothetical included a sit, stand or walking option of five to ten to fifteen minutes and that no sedentary position would allow an individual to walk fifteen minutes at a time.  The actual sit/stand option presented stated, "...he must utilize a five to ten even sometime 15 minute sit/stand option" and also that he would need to change postures from walking to sitting to standing potentially the same amount of time.  (AR 331.)   These limitations are not unclear, they state he would have to change positions every five to fifteen minutes, from walking to standing to sitting.  Given these limitations, the vocational expert testified to four different jobs Petitioner could perform.  As the ALJ can rely on the vocational expert's testimony, his finding that there were jobs in the national economy Petitioner could perform despite his limitations is supported by substantial evidence.

**D.       Disregard of Dr. Garber's Opinion**

Petitioner lastly argues that the ALJ improperly disregarded the opinion of Dr. Garber because he failed to provide clear and convincing reasons for rejecting his opinion and the

reasons he did give are based on incorrect facts with disregard to the evidence as a whole.

An ALJ is not required to accept an opinion of a treating physician if it is conclusory and found to be unsupported by clinical findings. *Matney ex rel. Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992). Additionally, an ALJ is not bound to a physician's opinion of a petitioner's physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

An ALJ may reject a treating or examining physician's uncontradicted opinion for "clear and convincing" reasons. *Id*. To reject the opinion of a treating physician which conflicts with an examining physician's opinion, the ALJ must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Id*. The ALJ can "meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id*.

If the record as a whole does not support the physician's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities. *See id*.; *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999).

The ALJ gave several reasons for affording Dr. Garber's opinion little weight, including that his conclusion of total disability is not supported by the other evidence in the record and that other treating physicians, including Drs. Curran, Walker, Burks, Radnovich and Gustaval, stated

they did not find Petitioner to be totally disabled and that he is not precluded from all work activity.  Conflicting medical opinions and conflicting evidence in the record are clear and convincing reasons for rejecting a physician's opinion.  Additionally, the ALJ did not state he rejected Dr. Garber's opinion but that he gave it less weight.  The Court would also note that one month after stating Petitioner was "definitely unable to work," Dr. Garber said only that Petitioner was prevented from "any kind of active job."  (AR 198, 278-88.)

One other reason provided by the ALJ for giving Dr. Garber's opinion minimal weight was that it appeared from the record that Dr. Garber only examined the claimant on two occasions over a one year period.  (AR 22.)   Frequency of examination is one consideration when an ALJ evaluates medical opinions.  20 C.F.R. § 404.1527(d)(2)(i).  In reviewing the record, it appears that Dr. Garber did see Petitioner on more than just the two occasions noted by the ALJ.  However, there is not a substantial number of other examinations.  The record shows that Petitioner was examined by Dr. Garber in September of 2000 (AR 116), four telephone conversations and one examination occurred in 2002 (AR 199-200), and there was another examination in May 2003 (AR 278).  From the record, there appears to be only two more examinations, and four telephone conversations, than what was noted by the ALJ in his decision.  A total of four examinations over three years does not make Dr. Garber's opinion more significant than physicians who saw him on a much more frequent basis.  Although the ALJ was incorrect in stating there were only two examinations in one year, this was not his only reason for giving little weight to the doctor's opinion.  The fact that Dr. Garber did only examine Petitioner four times, from what can be ascertained from the record, and that his opinion conflicted with the medical evidence and opinions of other physicians, are clear and convincing

reasons for not conclusively accepting Dr. Garber's opinion as to Petitioner's ability to work.

## VI.
## Conclusion

Based on its review of the entire record, the Court finds that the Commissioner's decision is supported by substantial evidence and is not the product of legal error.  Therefore, the Commissioner's decision finding that the Petitioner is not disabled within the meaning of the Social Security Act will be affirmed.

## **ORDER**

Based upon the foregoing, the Court being otherwise fully advised in the premises, **it is hereby ORDERED that** the Commissioner's decision finding that the Petitioner is not disabled within the meaning of the Social Security Act be **AFFIRMED** and that the petition for review be **DISMISSED**.



DATED: March 15, 2007

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**Memorandum Decision and Order - Page 23**